UNITED STATES *v.* UNITED GEOPHYSICAL COMPANY (No. 4650)[1]

United States Court of Customs and Patent Appeals, March 6, 1951

*David N. Edelstein*, Assistant Attorney General (*Joseph F. Donohue* and *Alfred A. Taylor, Jr.*, special attorneys, of counsel), for the United States.

*James B. Christie, Tompkins & Tompkins* (*Allerton DeC. Tompkins* and *Robert L. Parker, Jr.*, of counsel) for appellee.

[Oral argument February 7, 1951, by Mr. Donohue and Mr. Allerton DeC. Tompkins]

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Associate Judges

WORLEY, Judge, delivered the opinion of the court:

This is an appeal by the Government from the judgment of the United States Customs Court, Second Division, C. D. 1238, involving the classification of one set of radar equipment, type 268/RXF.

The Collector of Customs classified the involved merchandise under paragraph 368 (a) (1) and (2) of the Tariff Act of 1930 as a "mechanism, device, or instrument intended or suitable for measuring * * * distance," and imposed duty at the rate of $4.50 plus 65 per centum ad valorem.

The importer protested the classification, contending that the merchandise was properly dutiable under paragraph 353 of the act,

---

[1] C. A. D. 451.

as modified by the Trade Agreement between the United States and the United Kingdom, 74 Treas. Dec. 253, T. D. 49753.

The involved paragraphs read as follows:

Par. 368. (a) Clocks, clock movements, including lever movements, clockwork mechanisms, time-keeping, time-measuring, or time-indicating mechanisms, devices, and instruments, synchronous and sub-synchronous motors of less than one-fortieth of one horsepower valued at not more than $3 each, not including the value of gears or other attachments, and any mechanism, device, or instrument intended or suitable for measuring time, distance, speed, or fares, or the flowage of water, gas, or electricity, or similar uses, or for regulating, indicating, or controlling the speed of arbors, drums, disks, or similar uses, or for recording or indicating time, or for recording, indicating, or performing any operation or function at a predetermined time or times, all the above (except the articles enumerated or described in paragraph 367), whether or not in cases, containers, or housings:

   (1) If valued at not more than $1.10 each, 55 cents each; valued at more than $1.10 but not more than $2.25 each, $1 each; valued at more than $2.25 but not more than $5 each, $1.50 each; valued at more than $5 but not more than $10 each, $3 each; valued at more than $10 each, $4.50 each;

   (2) any of the foregoing shall be subject to an additional duty of 65 per centum ad valorem;

\*      \*      \*      \*      \*      \*      \*

Paragraph 353 as amended by T. D. 49753:

Electrical signaling, radio, welding, and ignition apparatus, instruments (other than laboratory), and devices, electrical generators, transformers, converters, double current and motor generators, dynamotors, and all other articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, and articles having as an essential feature an electrical element or device, such as electric motors, locomotives, portable tools, furnaces, heaters, ovens, refrigerators, and signs (except telephone, wiring, diagnostic, and therapeutic apparatus, instruments, and devices, primary cells, flashlights, switches, switch gear, fans, blowers, washing machines, and machines not herein provided for by name which would be dutiable under paragraph 372, Tariff Act of 1930, if of a kind which could be designed to operate without such electrical element or device, \* \* \* 25% ad val.

The case was submitted upon an agreed statement of facts which we quote in full.

1. Type 268 and Type 268RXF radar are the same instrument.

2. The function and estimated performance of the radar equipment involved in this action is correctly described in "Technical Manual for Merchant Marine Type 268 Radar" published by the National Research Council of Canada, and more particularly as follows:

Page 1, SECTION 1—DESCRIPTION

1. FUNCTION

The type 268 equipment is a surface warning radar set. Its primary function is to aid in the detection of surface craft within a relatively small range, depending upon the size of the detected vessel (see below), and to give fairly accurate information about their range and bearing. It may also be used as an aid to navigation by determining coastal outlines.

## 2. ESTIMATED PERFORMANCE

Detection ranges on targets vary within the type of target, the height of the 268 serial, and with sea and atmospheric conditions. Rain squalls and electrical disturbances produce pictures on the screen of the cathode ray tube which interfere with efficient operation. Fog and mist reduce detection ranges slightly.

2.1 The length of the transmitter pulse and the effect of the "ground clutter" make it impossible to discern targets at less than 250 yards range. At ranges greater than 1,000 yards it should be possible to distinguish one small target from another if they are on the same bearing, but differing in range by 200 yards. If targets are less than 200 yards apart, their echoes will merge and form a short line. If a very large target visually obscures a small target behind it, no echo will be received from the small target. Bearing discrimination should be such that two small targets at 5,000 yards, 200 yards apart may be distinguished as two separate targets.

2.2 Bearing accuracy is of the order of ±2°. When the range reading is obtained by estimating the position of the echo relative to the calibration rings, the accuracy of the range readings is ±200 yards on the 6,000 yard range, and ±500 yards or better on the 30,000 yard range. * * *

3. There are two types of radar systems; namely, pulse radar and c–w or continuous wave radar. The type 268 radar here involved is of the pulse type.

4. In the pulse radar system sharp bursts of radio energy are sent out, i. e. transmitted. When these bursts or "pulses" encounter a reflecting object they are reflected as discrete pulses which are detected by the radar receiver during the interval between the transmitted pulses.

5. The particular radar set here involved is shown in block diagram in Fig. 49 of the "Technical Manual for Merchant Marine Type 268 Radar" * * * and operates as follows:

Radio waves at a frequency of 10,000 megacycles per second are produced by the transmitter as follows:

A 500 cycle A. C. power supply is used to trigger (start) a time base generator (1) which produces a positive saw-tooth wave form (2). This "time base" voltage (positive saw-tooth wave) is applied to a delay circuit (3) to produce a negative square wave (4) which is used to trigger the modulator (5). This voltage is reshaped and employed to supply a high voltage pulse to the transmitter (6). This pulse causes the transmitter to oscillate at a wave length of 3.2 cm, for a duration of about ¾ microsecond. This pulsed oscillation, which takes place 500 times per second, is sent through the duplexing system (7) to the aerial (8). The duplexing system acts as an automatic switch for the aerial so that it alternately transmits and receives.

The transmitted pulse, directed by the antenna, encounters an object or target in space. A radar target may be thought of as a discontinuity in the electrical properties of the medium through which the transmitted radio wave travels. If any of the electrical properties of conductivity, dielectric constant and magnetic permeability change abruptly, a current is induced at the surface of the discontinuity when the wave impinges on it. This induced current which produces reradiation from the target may be conduction current (alternating flow of free charges) or a displacement current (alternating elastic displacement of bound charges) depending upon whether the target is a conductor or dielectric. In other words the transmitted pulse on striking a target induces a current in the target which is reradiated from the target. The reradiated signal is generally propagated in all directions, i. e. the target acts as a scatterer of radio energy falling upon it. Its efficiency as a scatterer and hence the strength of the signal returned to the antenna is variously designated as the "scattering cross section", "radar cross section" or simple "echo area". The duplexing system, acting as a switch, renders the antenna or aerial receptive to the reradiated signal for comparitively [sic] long intervals between transmitted pulses.

In these intervals between transmitted pulses, the duplexing system passes the return or reradiated signal as well as the transmitter pulse into the receiver (9). This signal is amplified, i. e. increased in magnitude without changing its frequency. Part of the amplified signal is sent to a monitor cathode ray tube (10) which, as

the name implies, is used to check on its performance, and detect breakdowns. The remainder of the amplified signal is sent to a PPI cathode ray tube (11) (plan-position indicator tube) appearing as a "trace" (or line) on the screen of the tube. Time calibration signals or "pips" from the time base generator are impressed on the PPI tube to permit determination of the reflection interval and the deflection of the cathode beam is synchronized with the rotation of the aerial. Hence it is possible to read the "trace" with respect to distance and direction.

PERFORMANCE

6. The involved radar equipment, Type 268 cannot discern targets at less than two hundred and fifty (250) yards.

7. At ranges or distances greater than one thousand (1,000) yards said Type 268 radar cannot discern between two targets which are less than two hundred (200) yards apart. They will appear as a single target.

8. Range readings i. e. distance measurements obtained with the Type 268 radar for targets approximately six thousand (6,000) yards distant are subject to six and six tenths percentum (6.6%) error and for targets approximately thirty thousand (30,000) yards distant are subject to three and three tenths percentum (3.3%) error.

9. Subject to the errors indicated the radar Type 268 will give a measure of both the distance to and direction of a target from which a signal is reradiated.

10. The radar equipment involved in this case rectifies, modifies, controls and distributes electrical energy.

The rectification is accomplished in the power supply network which includes three rectifier circuits for providing from a 115 volt 500 cycle alternating current supply, a D. C. voltage for operation of the set.

The modification is accomplished in the modulator which receives a negative-going distorted square wave from the delay circuit and shapes this square wave to produce a positive-going pulse of a duration of about 6 to 8 microseconds.

The control is accomplished in the automatic voltage regulator which receives a 300 volt or greater unregulated input and provides 150 volts regulated output. Also a negative 650 volt unregulated input is regulated to a negative 300 volt regulated output.

The equipment distributes electrical energy in the form of a pulsed oscillation channeled through the duplexing system to the aerial where it is radiated in a direction determined by the orientation of the aerial at that instant.

11. The radar equipment involved in this case transmits and receives signals by means of electrical waves without a connecting wire; the transmission being accomplished by the generation of a pulse oscillation channeled through the duplexing system to the aerial where it is radiated from the aerial, the aerial also acting to pick up reradiated impulses which are again channeled through the duplexing system to the receiver.

12. The term "radar" was coined by the U. S. Navy in 1941 to describe equipment for *radio* *detection* *and* *ranging*, the word being formed from the letters italicized.

The trial court held that the doctrine of relative specificity was applicable and concluded that the imported merchandise responded to the provisions of paragraph 353, *supra*, with greater specificity than to those of paragraph 368, *supra*.

In their brief, counsel for the Government state that the importation is "both an article intended or suitable for measuring distance within the purview of paragraph 368, *supra*, and an article suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, within the purview of paragraph 353, *supra*." As

a result of such contention they conclude that the two competing paragraphs are equally specific and that, therefore, the paragraph providing for the high rate of duty (paragraph 1559 of the Tariff Act of 1930) should apply, citing the case of *United States* v. *R. W. Cramer & Co., Inc.*, 22 C. C. P. A. (Customs) 45, T. D. 47049.

Counsel for appellee argue against the applicability of paragraph 368, *supra*, contending that said paragraph is applicable only to an incidental and inaccurate use of the radar device, namely, in the measuring of distance; they also argue that the involved merchandise responds to the provisions of paragraph 353, *supra*, because, among other things, the radar device is used for electrical signalling, radio rectification, modification, control and distribution of electrical energy, citing the case of *United States* v. *Herman H. Sticht & Co.*, 22 C. C. P. A. (Customs) 40, T. D. 47048.

The issue at bar is whether the imported merchandise is properly classified as an instrument intended or suitable for measuring distance within the provisions of paragraph 368, *supra*.

The master rule, of course, in construing the various tariff acts is the ascertainment of Congressional intent. *Chicago Mica Co. et al.* v. *United States*, 21 C. C. P. A. (Customs) 401, T. D. 46927. In so doing, we believe the rule of construction commonly known as *ejusdem generis* is here applicable. In applying that doctrine to the devices described in paragraph 368, *supra*, we find such items as clocks designed to indicate, measure, and to keep time; we find mention of other mechanisms, devices, or instruments intended or suitable for measuring distance, speed, fares, the flowage of water, gas, electricity, and similar uses. We believe that paragraph was intended to apply to instruments designed to provide more accurate measurements than can be made by the instant device.

It is interesting to note, and we quote from the agreed statement of facts, that the radar device is designed

1. * * * to give fairly accurate information about their [targets] range and bearing. * * *

* * * * * * *

2.2 Bearing accuracy is of the order of ± 2°. When the range reading is obtained by estimating the position of the echo relative to the calibration rings, the accuracy of the range readings is ± 200 yards on the 6,000 yard range, and ± 500 yards or better on the 30,000 yard range. * * *

* * * * * * *

6. The involved radar equipment, Type 268 cannot discern targets at less than two hundred and fifty (250) yards.

* * * * * * *

8. Range readings i. e. distance measurements obtained with the Type 268 radar for targets approximately six thousand (6,000) yards distant are subject

to six and six tenths percentum (6.6%) error and for targets approximately thirty thousand (30,000) yards distant are subject to three and three tenths percentum (3.3%) error.

9. Subject to the errors indicated the radar Type 268 will give a measure of both the distance to and direction of a target from which a signal is reradiated.

\* \* \* \* \* \* \*

From an analysis of the evidence, we find the involved radar does not give accurate or exact information, but provides the kind described as "fairly accurate." For example, in paragraph 2 of the stipulation, as we construe the meaning of the various terms used, we find that when the range reading is obtained for estimating the position of the echo relative to the calibrated rings, the accuracy of such reading is, at 6,000 yards, plus or minus 200 yards, and at a distance of 30,000 yards the deviation can be plus or minus 500 yards or more. That part of the stipulation alone is sufficient, in our opinion, to indicate that the radar device is not the kind of "measuring of distance" apparatus embraced within paragraph 368, *supra*. Moreover, we find in paragraph 8 of the stipulation that when range readings with this type radar for targets are obtained at approximately 6,000 yards, such measurements are subject to 6.6 per centum error, although for targets approximately 30,000 yards distant, the error possibilities are reduced to 3.3 per centum. This fact is further evidence that paragraph 368, *supra*, was not intended to apply to such an article as that at bar.

Finally, when we consider the full import of paragraph 6 of the stipulation which states that the involved radar equipment cannot even *discern* (much less *measure*) targets *at less than 250 yards*, the applicability of paragraph 368, *supra*, to the distance measuring function of the involved merchandise is so remote as to convince us that Congress did not intend to bring such goods within that paragraph.

From the evidence in the record, we believe the primary function of the subject device is to *detect* objects, rather than to *measure distances*, although at the same time we are fully aware of the importance of the latter function, no matter how inaccurately it may operate in this respect. However, we do not feel that the admitted errors to which it is susceptible in estimating or measuring distances will permit us to bring it within that degree of accuracy which we feel is required by the articles enumerated in paragraph 368, *supra*. We believe that the subject device does not belong within the provisions of paragraph 368, *supra*, but properly comes within the provisions of paragraph 353, *supra*.

In view of our conclusions, it is not deemed necessary to discuss any of the other points raised or cases cited by counsel for the parties.

The judgment of the United States Customs Court should be and is hereby *affirmed*.